UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LEHMAN BROTHERS HOLDINGS INC., AS          :
DEBTOR AND DEBTOR-IN-POSSESSION IN         :
ITS CHAPTER 11 CASE IN THE UNITED          :
STATES BANKRUPTCY COURT FOR THE            :
SOUTHERN DISTRICT OF NEW YORK, CASE        :
NO. 08-1355 (JMP),                         :
                                           :    10 Civ. 4373 (SHS)
                              Plaintiff,   :
                                           :    OPINION & ORDER
            -against-                      :
                                           :
BETHANY HOLDINGS GROUP, LLC, THE           :
TERRY AND ROSE KNUTSON 2000 FAMILY         :
TRUST, and TERRY KNUTSON,                  :
                                           :
                              Defendants.  :
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

　　　Plaintiff Lehman Brothers Holdings, Inc., loaned defendant Bethany Holdings Group,

LLC, more than $200 million for the purchase of apartment properties in Arizona.  Defendants

The Terry and Rose Knutson 2000 Family Trust and Terry Knutson (collectively, the "Knutson

defendants") executed five guaranties in connection with Lehman's loans to Bethany.  After

Bethany defaulted on the loans, Lehman demanded payment on the guaranties.  The Knutson

defendants have not made payment claiming, *inter alia*, that the guaranties were fraudulently

induced.  Lehman initiated this suit in its attempt to recover on the guaranties.

　　　Discovery in this action is complete and this case is ready for trial.  Before the Court is

Lehman's motion to strike the Knutson defendants' jury demand.  Because the guaranties these

defendants executed contain enforceable jury waivers, the Court grants Lehman's motion.

## I.  BACKGROUND

The following facts are drawn from the pleadings as well as the exhibits submitted in connection with the motion to strike.

### A.  Phoenix Kingdom I Guaranties

Terry Knutson built a small bakery in rural California into a national frozen baked goods company that he sold for approximately $175 million in November 2006.  (Answer ¶ 75; Ex. 1 to Aff. of David Staubitz dated June 10, 2011 ("Staubitz Aff."); Dep. of Terry Knutson dated Feb. 14, 2011 ("Knutson Dep.") at 25:6, 29:5, Ex. 2 to Staubitz Aff.)  That sale prompted Knutson to seek real estate investment opportunities, which led him to Bethany Holdings LLC, an owner and operator of apartment complexes across the country.  (Answer ¶¶ 76, 78.)  Between March and June 2007, Knutson invested his own money and that of The Terry and Rose Knutson 2000 Family Trust in a series of five real estate acquisitions that Bethany organized.  (*Id.* ¶ 90.)  In these transactions the Knutson defendants provided equity funding, which Bethany leveraged with loan financing, largely from Lehman, to complete the acquisitions.  (*Id.* ¶¶ 90-96.)

This action concerns the third transaction Lehman financed—the purchase of the Phoenix Kingdom I ("PK I") portfolio of properties in Arizona in June 2007.  (*Id.* ¶¶ 94-95.)  Lehman provided three loans for the PK I purchase: a $164.5 million loan secured by the properties, a $37.16 million senior mezzanine loan, and a $34.64 million junior mezzanine loan.  (*Id.* ¶ 95.)

Knutson, acting individually and as co-trustee of the Knutson Trust, executed five guaranties in connection with the two mezzanine loans: one for the interest due on the senior loan through 2012, one for $1.1 million of the principal on the senior loan, one for the interest due on the junior loan, one for up to $5 million of the principal on the junior loan, and another guaranty for up to $5.5 million of the principal on the junior loan.  (Exs. 8-12 to Decl. of

Lawrence Ecoff dated June 24, 2011 ("Ecoff Decl.").)  Bethany and two of its principals, Greg

Garmon and Jeffrey Silverman, also executed the guaranties.  (*Id.*)

    The closing for the PK I transaction occurred on June 1, 2007.  Typically, in advance of a

closing, Lehman's law firm would send signature pages to Bethany's law firm, Rutan & Tucker

("Rutan"), which would coordinate execution of the signature pages for the loan documents and

then return them to Lehman's law firm.  (Dep. of Eugene Balshem dated Mar. 10, 2011

("Balshem Dep.") at 16:10-18, 48:15-17, Ex. 4 to Ecoff Decl.)   Rutan was responsible for

circulating documents to Knutson.  (*Id.* at 48:12-13.)  The actual loan documents were still being

worked out even after completion of the signature pages.  (Answer ¶ 92.)  The closing, however,

would not occur until the loan documents were finalized.  (Balshem Dep. at 15:6-10.)  The PK I

transaction employed this process.  (*See id.* at 16:19-21; Dep. of Gregory Garmon dated Mar. 8,

2011 ("Garmon Dep.") at 124:11-20, Ex. 2 to Ecoff Decl.)

    Knutson testified at his deposition that he did not see any of the loan documents in the

course of the PK I closing.  (Knutson Dep. at 158:22-23, Ex. 5 to Ecoff Decl.)  But Christopher

Engh, Knutson's personal attorney, was typically involved in the Bethany transactions on behalf

of the Knutson defendants.  Knutson described Engh's role as follows:

> Q: But isn't it correct that you would not allow a signature page to be used unless Mr.
> Engh had approved the final document?
> A: In most cases then I would try and protect that, yes, until he was satisfied with the
> wording in the documents.  In the cases where he was involved.  And they weren't
> released until he –
> Q: He gave his approval?
> A: – he gave his approval.

(Knutson Dep. at 70:4-12; *see also id.* at 120:15-19.)  Knutson has "no idea" whether Engh

authorized the release of the signature pages in connection with the PK I transactions, but he

"assume[s]" that was the case.  (*Id.* at 144:4-6.)  He also "assume[s]" that Engh had an

opportunity to review the guaranties prior to closing.  (*Id.* at 153:4-7.)  William Meehan, an

attorney at the Rutan firm who worked on this transaction, testified at his deposition that he

provided Engh with draft loan documents for the PK I transaction.  (Dep. of William Meehan

dated Mar. 3, 2011 ("Meehan Dep.") at 24:10-12, Ex. D to Letter to the Court from Joseph

Donley, Esq. dated Aug. 4, 2011 ("Donley Letter").)

       In each of the five guaranties at issue—reproduced at Exhibits 8 through 12 of the Ecoff

Declaration—paragraph nine contains the jury waiver and reads in its entirety as follows:

> As a further inducement to Lender to make the Loan and in consideration thereof,
> Guarantor further covenants and agrees (a) that in any action or proceeding brought by
> Lender against Guarantor on this Guaranty, Guarantor shall and does hereby waive trial
> by jury, (b) that the Supreme Court of the State of New York for the County of New
> York, or, in a case involving diversity of citizenship, the United States District Court for
> the Southern District of New York, shall have exclusive jurisdiction of any such action or
> proceeding, and (c) that service of any summons and complaint or other process in any
> such action or proceeding may be made by registered or certified mail directed to
> Guarantor at Guarantor's address set forth above, Guarantor waiving personal service
> thereof. Nothing in this Guaranty will be deemed to preclude Lender from bringing an
> action or proceeding with respect hereto in any other jurisdiction.

The style and size of typeface for this paragraph is no different from that of the others in the

guaranties.

      B.  <u>The Alleged Fraud</u>

       The Knutson defendants claim that they were fraudulently induced into guaranteeing the

PK I loans.  According to the Knutson defendants, at the time of the PK I purchase Bethany did

not have the capital or the capacity to maintain the apartment complexes it had acquired,

(Answer ¶ 83); it was "was essentially a 'house of cards' [such] that any market downturn or

other adverse change could quickly render it incapable of meeting debt service requirements,

triggering portfolio-wide loan defaults and—as subsequently occurred—Bethany's total collapse

under its unsustainable debt load," (*id.* ¶ 102).  Bethany's principals, Garmon and Silverman,

4

"were [also] essentially insolvent and lacked any meaningful capacity to assume and fulfill their obligations as the Knutson Defendants' co-guarantors."  (*Id.* ¶ 104.)

The Knutson defendants maintain that they were unaware of this supposed insolvency. But Lehman was aware of this information, or so the Knutson defendants claim.  (*Id.* ¶ 99-104.) It is their position that Lehman withheld this information from Terry Knutson in order to give him "the misimpression that Bethany and its principals were creditworthy and otherwise financially sound," and thereby induce him to enter into the guaranties.  (*Id.* ¶ 108.)   Lehman's purported motivation for this alleged fraud was a desire to earn fees and improve the quality of the PK I loans for securitization and resale purposes.  (*Id.* ¶ 101.)

In addition to Lehman, the Knutson defendants claim to have relied on Bethany's principals and Bethany's law firm, Rutan, crediting their representations that they would look out for the Knutson defendants' best interests.  (*Id.* ¶¶ 92, 117.)  Yet these parties also withheld from Knutson Bethany's true financial picture (as Knutson alleges it to be).  (*Id.* ¶ 118.)  "In this manner, Bethany's principals and their counsel exerted undue influence upon Mr. Knutson and manipulated him so that he sacrificed himself for their best interests."  (*Id.*)

C.  This Action

By the beginning of 2009, Bethany had defaulted on the PK I loans.  (Compl. ¶¶ 48-49.) On May 4, 2010, Lehman notified the loan guarantors of the defaults and demanded payment of the guaranties, which was never made.  (*Id.* ¶ 53-54.)

Lehman initiated this action in June 2010 against Knutson, the Knutson Trust, and Bethany.  Lehman seeks to recover $33.4 million.  (Pl.'s Mem. in Supp. of Motion to Strike at 10 n.3.)  Bethany is now "defunct," (Answer ¶ 77), and has not appeared in this action.

Lehman has moved after the conclusion of all discovery proceedings to strike the Knutson defendants' demand that this case be tried to a jury. The Court heard oral argument on the motion on August 2, 2011 and granted the request of the Knutson defendants to submit a letter brief identifying additional material in the record supportive of their position. The Court has reviewed that additional submission, as well as Lehman's responsive brief. (*See* Letter to the Court from Kyle Bisceglie, Esq. dated Aug. 3, 2011 ("Bisceglie Letter"); Donley Letter.)

## II. DISCUSSION

"When asserted in federal court, the right to a jury trial is governed by federal law." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007). As this Court has previously written,

> [t]he parties to a contract may, by prior written agreement entered into knowingly and voluntarily, waive the right to a jury trial. However, the Seventh Amendment right to a jury is fundamental, and there is a presumption against its waiver. Contract provisions waiving the right are narrowly construed, and the requirement of knowing, voluntary, intentional waiver is strictly applied. Nevertheless, jury trial waivers are common in loan agreements and loan guarantees, and these are regularly enforced. The factors a court must consider in determining whether a contractual waiver of a right to a jury trial was entered into knowingly and voluntarily include: 1) the negotiability of contract terms and negotiations between the parties concerning the waiver provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative bargaining power of the parties; and 4) the business acumen of the party opposing the waiver. When the criteria outlined above have been met, the waiver has been deemed enforceable.

*Morgan Guar. Trust Co. of New York v. Crane*, 36 F. Supp. 2d 602, 603-04 (S.D.N.Y. 1999) (citations omitted). "The burden of proving that a waiver was knowing and intentional rests with the party attempting to enforce the purported waiver." *Sullivan v. Ajax Navigation Corp.*, 881 F. Supp. 906, 910 (S.D.N.Y. 1995).

The Court notes at the outset that the Knutson defendants' claim that the guaranties were fraudulently induced is not a ground for invalidating the jury waivers contained in those guaranties. "[U]nless a party alleges that its agreement to waive its right to a jury trial was itself

induced by fraud, the party's contractual waiver is enforceable vis-à-vis an allegation of fraudulent inducement relating to the contract as a whole." *Merrill Lynch*, 500 F.3d at 188. Because the Knutson defendants do not allege that the jury waiver provisions themselves were procured by fraud, the question for consideration is simply whether the jury waivers were entered into by the Knutson defendants knowingly and voluntarily.

      A.  <u>Knutson's Opportunity to Review the Guaranties</u>

      The Knutson defendants' primary argument does not address the *Morgan Guaranty* factors.  They contend instead that because Knutson signed the signature pages of the guaranties prior to the closing without the opportunity to personally review the content of the guaranties, he cannot be said to have knowingly and voluntarily agreed to the jury trial waiver they contained. Lehman counters that Knutson's personal attorney had the opportunity to review the loan guaranties prior to authorizing use of the signature page on behalf of the Knutson defendants, a fact that renders Knutson's personal ignorance of the waivers inconsequential.  The Court agrees with Lehman.

      A lawyer can bind his client to a contract if the client has authorized the lawyer to do so. *See, e.g.*, *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 343-47 (S.D.N.Y. 2010) (adopting Report and Recommendation); *see generally* Restatement (Third) of Agency § 6.01. The Court sees no basis for why a lawyer's authority in this regard should not include the authority to accept a jury waiver.  After all, a lawyer in civil litigation can through his own error waive his client's jury trial right.  *See Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 307 (2d Cir. 1986).  It certainly follows that a lawyer in a commercial negotiation who has the authority to agree to a contract on his client's behalf and has had an opportunity to review the contract can provide a knowing and voluntary assent to a jury waiver on his client's behalf.

The evidence here is that Knutson's personal attorney, Christopher Engh, had the authority to bind the Knutson defendants to a jury waiver.  Knutson testified at his deposition that in his dealings with Bethany he permitted the use of a signature page containing his signature only after Engh "was satisfied with the wording in the documents" and "gave his approval."  (Knutson Dep. at 70:4-12; *see also id.* at 120:15-19.)  Although there is no specific evidence that this procedure was followed in the case of the PK I transaction, Knutson "assume[s]" that it was.  (*Id.* at 144:4-6.)  He also "assume[s]" that Engh had an opportunity to review the loan guaranties prior to closing, (*id.* at 153:4-7), an assumption that accords with the testimony of Meehan, the Rutan lawyer who sent Engh draft loan documents for the PK I transaction, (Meehan Dep. at 24:10-12).  The Court therefore accepts Knutson's testimony that his personal attorney, acting within his authority, authorized the use of the contract page containing Knutson's signature and that the attorney had an opportunity to review and approve the loan guaranties before doing so.  In light of this fact, that Knutson did not personally review the loan guaranties prior to the closing of the PK I transaction does not invalidate the jury waivers.

### B. *Morgan Guaranty* Factors

Turning to the *Morgan Guaranty* factors, the Court concludes that they weigh decidedly in favor of enforcing the jury waivers.

Though the Knutson defendants correctly point out that there is no evidence that there was negotiation of the PK I guaranties with Knutson himself, the Court nevertheless concludes that the guaranties were able to be negotiated.  Negotiability does not require evidence of actual negotiation over the waiver provision or even over the contract itself; the negotiability prong is satisfied as long as there was an opportunity for negotiation, even if the party opposing the

waiver did not avail himself of that opportunity.  *See, e.g.*, *Morgan Guar.*, 36 F. Supp. 2d at 604 ("Simply because the Cranes did not attempt to negotiate its provisions does not mean that, in fact, the waiver or other terms in the note were not negotiable."); *Oei v. Citibank, N.A.*, 957 F. Supp. 492, 523 (S.D.N.Y. 1997) ("Simply because Oei did not negotiate these provisions, and because the form was created by Citibank, does not mean that the waiver or other terms in the application agreement were not negotiable.").  That Knutson was represented by counsel and that his attorney would approve the loan documents prior to closing certainly suggests that the Knutson defendants had the opportunity to participate in negotiations.  *See Adelphia Recovery Trust v. Bank of America, N.A.*, No. 05 Civ. 9050, 2009 WL 2031855, at *4 (S.D.N.Y. July 8, 2009) (representation by counsel indicative of negotiability).  So too does the evidence that in one of the two Lehman-Bethany-Knutson transactions preceding PK I, Knutson and his advisors reviewed the deal documentation and flagged issues needing resolution in the days leading up to the closing, (Ex. 27 to Staubitz Aff.).  *See Morgan. Guar.*, 36 F. Supp. 2d at 604 ("[T]he fact that the Cranes had previously negotiated changes to agreements made with Morgan further demonstrates their ability to negotiate with the bank.").  There is no viable evidence that rebuts these clear indications that the PK I loan guaranties were negotiable.[1]

---

[1]    After oral argument—and well after the close of fact discovery and well after the motion was made—the Knutson defendants submitted an affidavit from Knutson's attorney, Engh, concerning the negotiability of the PK I transaction.  (*See* Aff. of Christopher Engh, Esq. dated Aug. 3, 2011 ("Engh Aff."), Ex. C to Bisceglie Letter.)  The Court will not consider that affidavit.  The Court at oral argument permitted the Knutson defendants to make a submission highlighting material *that was in the record*, not to supplement the record.  There is no reason to allow this new evidence.  The validity of the jury waivers was an issue from the outset of this case.  (*See* Discovery Plan and Fed. R. Civ. P. 26(f) Conference Report at ¶ 6.)  The Knutson defendants were able to elicit evidence from Engh during discovery, when his role in the Bethany transactions was a recurring focus of attention, (*see, e.g.*, Knutson Dep. at 70:4-12, 120:15-19; Meehan Dep. at 23:10-25:9; Balshem Dep. at 11:20-12:4, Ex. B to Bisceglie Letter; Dep. of Mark Osgood dated Mar. 9, 2011 at 114:9-11, Ex. 3 to Ecoff Decl.).  The Court will not permit them to supplement the record at this late stage via a self-serving affidavit.

In any event, Engh's affidavit does not dissuade the Court from its conclusion.  Although Engh does not recall reviewing the "*final version* of the loan documents" for the PK I transaction prior to closing, (Engh Aff. ¶ 5 (emphasis added)), he does not deny that that was his responsibility in connection with the Knutson defendants' transactions with Bethany.  Nor does he deny seeing prior versions of the loan documents.  And while he states that he never "discuss[ed] or negotiate[d]" the guaranties with Lehman, (*id.* ¶ 3), nothing in his affidavit indicates that he

Next, the Court is not concerned that the Knutson defendants lacked sufficient bargaining power in this transaction.  This is not a case where one party's dire financial condition gave his counterparty undue leverage.  *See, e.g.*, *Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977).  Nor does the mere fact that Lehman was a major financial institution necessitate the conclusion that the Knutson defendants lacked adequate bargaining power.  *See Morgan Guar.*, 36 F. Supp. 2d at 604.  The PK I transaction was an optional investment opportunity for the Knutson defendants; they could have taken their money and invested it elsewhere.  And they knew they could seek financing elsewhere; a different bank financed the first Bethany acquisition in which the Knutson defendants invested, (Ex. 11 to Staubitz Aff.).  *Cf. Oei*, 957 F. Supp. at 523 (evidence that party opposing waiver sought credit from another bank was evidence of bargaining power).

The Court also easily concludes that the Knutson defendants had sufficient business acumen at their disposal.  Terry Knutson built and ran a national enterprise.  In the process, he negotiated loans for his corporation and reviewed loan documentation, was involved in the purchase and sale of real estate, and participated in negotiations for the $175 million sale of his business in 2006.  (Knutson Dep. at 15:5-16:23, 23:10-24:15.)  Moreover, throughout the course of his involvement with Bethany, Knutson demonstrated business acumen by requesting specific data and asking specific, detailed questions about the sophisticated transactions Bethany proposed.  (Exs. 8, 9 to Staubitz Aff.)

Finally, the Court concludes that the jury waivers in the guaranties are sufficiently conspicuous to warrant enforcement.  They are not buried in fine print or masked by jargon.  They are legible—appearing in the same font and size as all the other provisions in the

---

was precluded from doing so except for his unsubstantiated assertion that it was his "understanding" that the guaranties were nonnegotiable, (*id.* ¶ 4).

contract—and clearly stated—appearing in plain terms in the very first sentence of the paragraph in which they appear.  Courts have enforced similar waivers.  *See Wechsler v. Hunt Health Sys., Ltd.*, No. 94 Civ. 8294, 2003 WL 21878815, at \*5 (S.D.N.Y. Aug. 8, 2003); *Bank of China, New York Branch v. NBM L.L.C.*, No. 01 Civ. 815, 2002 WL 1072235, at\*3 (S.D.N.Y. May 28, 2002).  The Knutson defendants make much of the fact that the waivers do not have features such as capital letters or placement immediately above the signature line that serve to call attention to a jury waiver's presence.  But the sheer repetition of this jury waiver provision over the parties' extended and repeated business dealings accomplished the same end.  In two Lehman-financed transactions prior to the PK I deal at issue in this litigation, Knutson executed five guaranties containing jury waiver provisions that are identical in wording, appearance, and placement to each other and to the waivers here.  (*Compare* Exs. 18, 19, 28, 29, 30 to Staubitz Aff. *with* Exs. 8-12 to Ecoff Decl.)  The Court rejects the notion that a clearly legible and plainly stated provision that appeared repeatedly in documents counsel had the opportunity to review is somehow too inconspicuous to be enforced.  *See N. Feldman & Son, Ltd. v. Checker Motors Corp.*, 572 F. Supp. 310, 313 (S.D.N.Y. 1983) (enforcing a jury waiver in part because the party opposing waiver had previously entered into a similar agreement with the same counterparty containing the same jury waiver provision); *cf. Schappert v. Bedford, Freeman & Worth Pub. Group, LLC*, No. 03 Civ. 58, 2004 WL 1661073, at \*11 (S.D.N.Y. July 23, 2004) (the fact that the jury waiver provision was contained in each successive draft of a contract supported finding that the provision was conspicuous).

      To be sure, the jury waivers here could have been more prominent.  In general, it is advisable that they be so.  "It is elementary that the Seventh Amendment right to a jury is fundamental and that its protection can only be relinquished knowingly and intentionally."

*Hendrix*, 565 F.2d at 258. Capital letters, clear headings, and placement near a signature line help ensure that a party's jury waiver is knowing and voluntary. But that does not mean that all cases require such features to demonstrate a knowing and voluntary waiver. Here, the evidence adduced shows that the Knutson defendants, acting both with and through their attorney, had sufficient bargaining power and business acumen to negotiate the PK I loan guaranties. Furthermore, the jury waivers they agreed to were sufficiently conspicuous by virtue of their plain and clear language and placement within the PK I guaranties and the recurring presence of identical waivers throughout the parties' course of dealing. On the basis of this evidence, the Court concludes that Lehman has met its burden of showing that the Knutson defendants knowingly and voluntarily agreed to waive their right to a jury trial.

**III. CONCLUSION**

Because the Court concludes that the Knutson defendants knowingly and voluntarily contracted to waive their right to have this action tried by a jury, Lehman's motion to strike the Knutson defendants' jury demand is granted.

Dated: New York, New York
      August 5, 2011

SO ORDERED:

Sidney H. Stein, U.S.D.J.